IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville June 23, 2015

**STATE OF TENNESSEE v. ERIC DARNELL WHITAKER**

**Appeal from the Circuit Court for Maury County**
**No. 21795    Stella Hargrove, Judge**

---

**No. M2014-01304-CCA-R3-CD – Filed September 22, 2015**

---

The Defendant, Eric Darnell Whitaker, was found guilty by a Maury County Circuit Court jury of attempt to commit first degree premeditated murder, a Class A felony, two counts of aggravated assault, Class C felonies, reckless endangerment, a Class E felony, and theft of property valued at $1000 or more but less than $10,000, a Class D felony. *See* T.C.A. §§ 39-13-202 (2014), 39-12-101 (2014), 39-13-102 (Supp. 2011) (amended 2013), 39-13-103 (2010) (amended 2011, 2012, 2013), 39-14-103 (Supp. 2011) (amended 2014). The trial court sentenced the Defendant as a Range I, standard offender to twenty years for attempted first degree murder, five years for each aggravated assault, two years for reckless endangerment, and three years for theft. The court ordered consecutive service for one aggravated assault, the reckless endangerment, and the theft sentences, for an effective thirty-year sentence. On appeal, the Defendant contends that the evidence is insufficient to support his attempted first degree murder and theft convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Andrew Love (on appeal), Nashville, Tennessee, and Gary Howell (at trial), Mount Pleasant, Tennessee, for the appellant, Eric Darnell Whitaker.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; T. Michel Bottoms, District Attorney General; and Brent Cooper and Kevin Latta, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The present case results from a series of events on December 9, 2011, that began with Laquisha Dansby's providing the Defendant transportation home. After Ms. Dansby drove the Defendant home, he entered his father's truck parked in the driveway and chased after Ms. Dansby's car. During the chase, the truck struck Ms. Dansby's car, causing both vehicles to leave the roadway. Ms. Dansby and the Defendant were able to return their damaged vehicles to the roadway, and Ms. Dansby drove to a nearby convenience store seeking assistance. While Ms. Dansby spoke to two employees, the Defendant drove the truck into the store, injuring one of the employees and causing extensive damage to the store. After the crash, the Defendant exited the truck, walked out of the store, entered a SUV parked outside, drove out of the parking lot and onto the roadway, and caused a head-on collision with a delivery truck, injuring the Defendant and the driver of the delivery truck.

At the trial, Surendrakuna Patel testified that on December 9, 2011, at 9:00 a.m., he was working at Columbia Market Store. He identified a recording from the surveillance camera inside the store. The recording showed Mr. Patel and his daughter-in-law, Hiral Patel, leaving the store. Mr. Patel said that an African-American woman touched the cage of propane tanks with her car and that they went outside to investigate. He said the woman driving the car appeared scared and asked permission to come inside because her boyfriend was "after" her. Mr. Patel and his daughter-in-law reentered the store. He was scared because he thought something was going to happen, although he did not know what.

Mr. Patel testified and the surveillance recording reflects that after he reentered the store, he stood near the front entrance. In the recording, a woman ran inside the store, and seconds later a brown truck, later identified as a Toyota Tundra, struck the woman's car and drove through the store's front entrance, striking the counter. Mr. Patel was knocked backward and fell to the floor. Mr. Patel's daughter-in-law helped him up, and they ran to the back room of the store. The woman entered the walk-in cooler area of the store. The driver of the truck got out of the truck and left the store. Minutes later, the woman left the walk-in cooler area, looked at the scene, and placed her hands on her head.

Mr. Patel testified that he saw the truck driving toward the store before it struck the building and that he thought he was going to die. He was struck by debris and was taken to the hospital for treatment. He sustained broken ribs and said he had been unable to work since the incident. He said it took about thirty days to repair the damage to the store. He could not identify the driver of the truck.

On cross-examination, Mr. Patel testified that his son, Deepen Patel, owned Columbia Market Store. He agreed the woman who drove onto the sidewalk hitting the propane tanks was in a white car. He said that the propane tanks were enclosed in a metal cage and that the woman's striking the cage with her car caused slight damage. He denied calling the police about the woman's striking the cage and did not know if anyone else called. He said he had not reviewed the surveillance recordings before the trial. He clarified that at the time of the trial, he could only work for a few hours a day because he suffered from "hard breathing" and daily back pain. He did not suffer from those conditions before the incident. He agreed that his daughter-in-law told him not to allow the woman driving the white car inside the store and that the woman parked her car in front of the store's front entrance.

Edwin McKinnon testified that he lived about 200 or 300 yards from Columbia Market Store and that on December 9, 2011, he went inside his house when he heard the sound of brakes and a vehicle crash. He looked out the window and saw a truck attempting to drive out of a field. He also saw a car traveling toward the store that was attempting to drive out of the field. He said the car drove out of the field and onto the road, and the truck ultimately drove out of the field and onto the road but had difficulty because the truck's front bumper was folded into the tire.

Mr. McKinnon testified that the driver of the truck got out of the truck, walked to the truck's passenger side, inspected the front tire and bumper, and got into the truck. He said the truck left the scene driving toward the store. He could not recall if the truck's brake lights were visible. He said that an apartment complex, a subdivision, and a single house were located between the accident scene and Columbia Market Store.

On cross-examination, Mr. McKinnon testified that the car and the truck were in the field just in front of the apartment complex. On redirect examination, he said the driver was the only person he saw inside the truck.

George Street testified that on December 9, 2011, he stopped at Columbia Market Store to purchase a cup of coffee. He drove a red Chevrolet truck to the store. After he bought his coffee and returned to his truck, he saw a woman driving a white car pull into the parking lot. He said the woman "hit the side of the building" with her car, backed up, got out of her car in a panic, waved her hands, and hollered. Mr. Street intended to leave but saw a man driving a truck pull into the parking lot, drive past his red truck, and drive into the store. Mr. Street identified the various vehicles on the store's surveillance recordings.

Mr. Street testified that he got out of his truck about the same time as the driver of the truck that went into the building. Mr. Street saw the man driving the truck walk through the parking lot and get inside an SUV at the gas pump while the owner was pumping gas. Mr.

Street saw the man drive away in the SUV and cause a head-on collision with a delivery truck. He said the man got out of the SUV, "staggered . . . past the gas pumps," and fell on the ground. He identified surveillance recordings from outside the store, which were consistent with his testimony.

Charlie Jones testified that on December 9, 2011, he worked for Columbia Power and Water System and that he and his coworker, Daryl Walker, were sitting in their truck alongside the road near Columbia Market Store completing paperwork. Mr. Jones saw smoke coming from a truck about 100' down the road. He said that the truck had damage to the driver's side but that the truck traveled at a high rate of speed toward the store. He heard the truck's tires "squalling" and saw the truck narrowly miss the gas pumps in the store's parking lot. Mr. Jones said the truck increased its speed, hit the side of a white car, and "charged right on into the building." He said that the next thing he recalled was a delivery truck passing their location. He heard the delivery truck's brakes "lock up" and the sound of a crash. On cross-examination, Mr. Jones testified that it looked as though the driver of the truck was "fighting" the steering wheel.

James Williams testified that on December 9, 2011, he drove a bread delivery truck. He recalled driving toward Columbia Market Store and said that as he was passing the store, a Dodge Durango SUV pulled out onto the road and caused a head-on collision with his delivery truck. He identified a surveillance recording from the store, which reflected the SUV pulling onto the road and hitting Mr. Williams's delivery truck. Mr. Williams said he was able to get out of his truck and was treated by paramedics at the scene. He learned later he had suffered a broken shoulder. His recovery took five months, although his arm continued hurting and had reduced motion.

Mr. Williams testified that he heard someone yell, "He stole my vehicle," and that he backed away from the SUV. He said the driver of the SUV did not say anything. Although Mr. Williams did not see the driver's face entirely, he knew the driver was a man. The man walked a short distance and collapsed on the ground. Mr. Williams did not see anyone else inside the SUV.

Andrea Stavropoulos testified that on the morning of December 9, 2011, she was driving home from Columbia State Community College and that as she approached an apartment complex near Columbia Market Store, she saw a truck "parked erratically on the side of the road." She said the truck backed up, almost struck her Dodge Durango SUV, and drove toward the store. She called 9-1-1. She followed the truck and said she saw the truck turn into the store parking lot, strike a small tree, and drive through the building. She saw the truck strike a man inside the store. While on the phone with the 9-1-1 dispatcher, she parked her Durango at one of the gas pumps, got out, entered the store, and checked on the people

inside. She asked a woman working inside the store if she knew where the driver of the truck was located, and she heard someone say the driver of the truck was stealing Ms. Stavropoulos's SUV.

Ms. Stavropoulos testified that she did not see a white car when the Defendant almost struck her SUV. She identified portions of surveillance recordings from outside Columbia Market Store, which reflected her arrival at the store, exiting her SUV, and entering the store. She said she entered the store just as the driver of the truck walked outside. She did not realize the man was the driver at the time. Although the events transpired quickly, she said she must have left her keys in the ignition. She identified a portion of the surveillance recording in which the driver of the truck entered her SUV. She denied giving the man permission to drive her SUV.

Ms. Stavropoulos testified that in 2011, she paid $17,000 for her SUV and that she owed $9000 at the time of the incident. She did not have insurance coverage on the SUV and said it was a total loss.

Ms. Stavropoulos testified that after the man drove her SUV into the delivery truck, she checked on the driver of the delivery truck and walked to her SUV to retrieve her purse and backpack. She said the man was still in the driver's seat of the SUV. She identified the driver as the Defendant and said he was bleeding, "came to," opened the driver's door, and stumbled about 100' from the SUV.

On cross-examination, Ms. Stavropoulos testified that when she saw the truck on the road near the apartment complex, she saw white smoke coming from the truck. She agreed the Defendant walked past her as she entered the store. She said she did not look at his face as she entered because she thought the Defendant was a customer inside the store. She first saw the Defendant's face when she retrieved her belongings from her SUV. She thought she told the investigating police officers that the Defendant was driving "crazy" or erratically. She agreed the truck first struck the white car parked outside the store.

Bethany Young testified that on December 9, 2011, she was employed at Impact Center and that she drove a commercial van transporting disabled persons to work. She recalled that four clients were in the van that morning. She said that she was driving toward Columbia Market Store, that a brown truck passed her quickly, and that the truck passed additional vehicles in front of her van. She said cars on the road took action to avoid hitting the truck.

Ms. Young testified that the brown truck "interacted" with a woman driving what she thought was a white Buick just in front of the apartment complex. She said the truck bumped the white car and pushed the car into the grass. Ms. Young stopped the van and called 9-1-1. She said the truck also went off the road and hit a telephone pole. She said the woman driving the white car was able to return to the road, but the truck was stuck momentarily because of damage caused by hitting the telephone pole. She said that after the truck returned to the road, it drove toward Columbia Market Store. She said that the truck traveled fast and that she followed the truck. She said that the truck turned into the store parking lot and that when she arrived, the truck had been driven through the building.

Ms. Young testified that she saw the man driving the truck look under the truck after he got out and that the man walked outside the store. She saw a woman drive into the parking lot and park at a gas pump. Ms. Young said the woman walked inside the store to assist anyone who was injured. Ms. Young said that while the woman was inside the store, the man driving the truck got inside the woman's SUV and drove away. Ms. Young recalled that the woman left the driver's door open and the engine running. She identified the woman and the woman's Dodge Durango in the surveillance recording.

Ms. Young testified that she yelled for the man not to take the SUV and that the man acknowledged he heard her. She said that after the man collided with the delivery truck, the man walked to her van and collapsed. She identified the Defendant as the man who collapsed near her van. She told the Defendant that it was over and that it would be okay. The Defendant acknowledged he heard her, although he looked as though he was going to pass out. She identified the portion of the surveillance recording reflecting that the Defendant walked toward her van and collapsed after the collision with the delivery truck. She recalled the police thought the Defendant was deceased when they arrived but said the Defendant was unconscious. She recalled the police finding a pill bottle in the Defendant's pants pocket.

On cross-examination, Ms. Young testified that after the truck passed her van on the road, about three vehicles separated the truck and the white car and that the truck passed those vehicles. She did not see the Defendant get out of the truck after the truck hit the pole, although Ms. Young saw the truck was damaged. She said the truck had difficulty staying within its lane of travel after it struck the pole. She said that to her knowledge, nobody was around the white car when the truck hit the car. She agreed the truck hit the white car and went through the store. She thought the Defendant might have had a little blood on his nose. She recalled the Defendant looked angry and had wide eyes. She said that after the Defendant got into the SUV and collided with the delivery truck, she heard him making grunting sounds. She agreed she did not mention in her written police statement that the Defendant looked under the truck after he drove through the store.

Ms. Young reviewed the portion of the surveillance recording reflecting the Defendant's slipping on debris after he left the truck but said that the recording showed the Defendant looked under the truck when he slipped. She agreed that she did not know if his eyes were open and that she was unsure if he looked under the truck.

Columbia Police Officer Cheryl-Lynn McPherson testified that she responded to Columbia Market Store and that the scene was chaotic. She identified the portion of the surveillance recording reflecting her arrival on the scene. She saw the Defendant had been detained by another police officer, and she approached the Defendant. She remained with the Defendant while another officer assessed the situation inside the store. The Defendant was unconscious and was transported by ambulance to a hospital. Inside the Defendant's jacket, she found a "clump" of green leafy substance, one small peach-colored pill, and an empty prescription bottle for hydrocodone with the Defendant's name on it.

On cross-examination, Officer McPherson testified that Ms. Stavropoulos initially told the police that the Defendant grabbed her car key out of her hand as the Defendant walked out of the store. Officer McPherson agreed Ms. Young reported that she saw the Defendant grab Ms. Stavropoulos's car key out of Ms. Stavropoulos's hands and that she saw Defendant look under the truck after driving it inside the store. Officer McPherson's notes stated that the Defendant was incoherent at the scene, and she recalled the Defendant's lying in a pool of his blood and not making any sounds. On redirect examination, she stated that the Defendant had a strong odor of alcohol. A sample of the Defendant's blood was obtained and sent to the Tennessee Bureau of Investigation (TBI) for analysis.

Columbia Police Sergeant Nicole Fall testified that on December 9, 2011, she was assigned to the domestic violence unit and that she spoke to Laquisha Dansby, the driver of the white car, a Cadillac. Sergeant Fall said Ms. Dansby was "shaken up." Sergeant Fall said that on December 14, she and Detective Brian Goats spoke to the Defendant. She said the Defendant admitted driving the truck through Columbia Market Store, although he denied remembering "the actual accident." The Defendant told her that he "blacked out . . . in the store." Sergeant Fall said that as the interview progressed, the Defendant said his foot became stuck under the brake pedal, causing him to drive through the store. The Defendant stated that Ms. Dansby had picked him up and had taken him to his mother's house to obtain gas money. The Defendant stated that he was driving to the store to purchase cigarettes when he drove inside the store accidentally. Sergeant Fall said that as the interview progressed further, the Defendant stated that he and Ms. Dansby argued while parked in his mother's driveway, that he got out of Ms. Dansby car, and that he realized he did not have his wallet after Ms. Dansby drove away. The Defendant told Sergeant Fall that he obtained the key to the truck and followed Ms. Dansby to get his wallet or to find out what happened to it. The Defendant denied, though, that he drove at a high rate of speed or flashed the headlights and

said that he planned to pull beside Ms. Dansby's car. The Defendant said that he drove off the road during his pursuit, although he did not explain how, that the truck was damaged, and that he decided to drive to the store to repair the truck. The Defendant then began talking about his foot getting stuck under the brake pedal and said he did not remember anything else.

Sergeant Fall testified that the Defendant did not mention striking Ms. Dansby's car before reaching Columbia Market Store. Relative to the Durango, the Defendant said he thought the SUV was his green Prizm. The Defendant told Sergeant Fall that he had been diagnosed with bipolar disorder and paranoid schizophrenia. She said the Defendant did not say he heard voices or hallucinated.

On cross-examination, Sergeant Fall testified that during the interview, the Defendant was calm and alert. She agreed the waiver of rights form reflected that the Defendant reported current treatment by a physician for bipolar disorder, identified the medication he was taking, and said he last took the medication two days previously. She agreed the Defendant reported that he did not drink alcoholic beverages but that he last drank alcohol three days previously. She agreed the Defendant also mentioned having paranoid schizophrenia. She agreed the Defendant's account of the events were "all over the page." On redirect examination, Sergeant Fall stated that the Defendant never offered his medical conditions as a reason or excuse for the events.

Tennessee Highway Patrol Trooper Rick Alexander, an expert in forensic crash reconstruction, testified that on December 9, 2011, he and Sergeant Alan Brennis responded to Columbia Market Store to reconstruct the scene. He identified photographs he took of the Toyota Tundra truck while it was inside the store and photographs of the damage to the store. He identified photographs of Ms. Dansby's white Cadillac, the Dodge Durango, and the delivery truck.

Trooper Alexander testified that he also investigated the incident occurring in an open field near an apartment complex about two-tenths of one mile from Columbia Market Store. He found two distinct tire tracks, one matching a Toyota truck and another matching a Cadillac. Trooper Alexander said a utility pole, a concrete culvert, and a portion of the apartment complex's sign were damaged. He identified a diagram he prepared reflecting the direction in which the Cadillac and the Tundra traveled in the field. He said the tire tracks showed that the Tundra struck the utility pole and the apartment complex sign and that the truck became stuck, backed up, drove over the culvert and onto the road, and travelled toward the store. He said the truck sustained damage to the driver's side after striking the utility pole and to the passenger side after striking the sign. He said that based on the

-8-

"directionality of the tire marks [and] the shifting and changing directions," he concluded that the brakes on the truck functioned properly after the truck returned to the road.

Trooper Alexander testified relative to the area outside Columbia Market Store that he concluded the Tundra traveled over a grassy area surrounded by a curb, struck a small tree, drove under the canopy over the gas pumps, struck the corner of a concrete post, struck the parked Cadillac, and drove inside the store. He saw no indications that the driver of the Tundra attempted to slow down or stop at any time. He reviewed the surveillance recordings after he made his conclusions and noted that the truck's brake lights were never visible and that debris came from the driver's side rear wheel. He conceded he did not confirm if the brake lights were operational. Trooper Alexander stated that a tire mark in the parking lot showed the truck accelerated as it entered the store. Based on the surveillance recordings, he concluded that the truck accelerated as it entered the store because the rear wheels were spinning at a high rate of speed as it entered the store.

Trooper Alexander testified that he had investigated incidents in which a driver's foot had been caught under the brake or gas pedal and that he saw nothing to suggest it occurred in the present incident. He said the Tundra weighed about 5200 pounds.

TBI Special Agent April Bramlage, an expert in toxicology, testified her analysis of the Defendant's blood sample showed an alcohol concentration of 0.07%. She noted that the Defendant's blood was obtained at 3:20 p.m. at the hospital. She said that everyone eliminated alcohol from their bodies at a "rate of 0.01 to 0.02 hour." Based on the blood alcohol concentration at 3:20 p.m., the rate of elimination, and the incident occurring at 9:00 a.m., she concluded that the Defendant's blood alcohol concentration at the time of the incident was between 0.20% and 0.13%.

TBI Special Agent April Hagar, an expert in toxicology, analyzed the Defendant's blood for controlled substances. Her analysis showed the presence of cocaine, and she said that at most, the cocaine was ingested nine hours before the blood sample was obtained. She also found the presence of cocaethylene, a substance produced by the body when someone consumed cocaine and alcohol simultaneously. She said that drinking alcohol and consuming cocaine increased the duration of the effects. Her analysis also showed the presence of levamisole, a cutting agent used in the manufacture of cocaine. Her analysis also showed the presence of benzoylecgonine, a metabolite produced by the body after cocaine had been consumed. She said benzoylecgonine was indicative of cocaine use. Her analysis also revealed the presence of midazolam and Lidocaine, which were usually administered by medical personnel. She noted the presence of butalbital and said the substance might have been administered by medical personnel.

Special Agent Hagar testified that her analysis did not show the presence of marijuana or opioids. She described the effects of cocaine and noted that cocaine might cause excitement, restlessness, a lack of coordination, an inability to think critically, difficulty with divided attention tasks such as driving a vehicle, irritability, agitation, and a lack of impulse control.

On cross-examination, Special Agent Hagar testified that she was familiar with Geodon but that it was not a medication commonly analyzed in her work. She said butalbital was a prescription medication. She could not recall if Geodon was a type of butalbital medication. She said that based on the amount of the substances found during her analysis, she agreed the ability to exercise reflection and judgment might have been impaired.

TBI Special Agent Melinda Quinn, an expert in toxicology, testified that she analyzed the Defendant's blood for benzodiazepine. Her analysis showed the presence of alprazolam and midazolam, two types of benzodiazepine. She said alprazolam was also known as Xanax and was prescribed for anxiety and depression. She said midazolam was also known as Versed and was administered in a medical facility for sedation. She said the level of alprazolam was low in comparison to the levels she usually saw in driving under the influence cases and was within the therapeutic range of a standard dose to produce the desired effect. She said, though, that she would have expected the level to have been higher six hours before the Defendant's blood was obtained.

On cross-examination, Special Agent Quinn testified that it was extremely difficult to determine the exact level of alprazolam six hours before a blood sample was obtained. She was familiar with Geodon and said it was an antipsychotic or antidepressant medication. She said that a specific analysis was needed to determine the presence of Geodon and that she did not analyze the Defendant's blood for Geodon.

Laquisha Dansby testified that she met the Defendant in 2009 or 2010, that they had a brief romantic relationship in 2010, and that they remained friends afterward. She met the Defendant at The Discipleship House, a program in which the Defendant was a team challenge mentor. She described the program as a spiritual rehabilitation program for substance and alcohol abuse. She said that by the time of the incident, she and the Defendant no longer socialized.

Ms. Dansby testified that on December 8, 2011, she did not see the Defendant and that she had no plans to see the Defendant on December 9. She said that she was driving to meet her probation officer when she saw the Defendant walking down the road. She stopped to talk to the Defendant, who told her that he was out of gas, requested she drive him home to obtain money, and offered to pay for her assistance. She said that the Defendant entered her

-10-

car and that he smelled of alcohol. She said she asked the Defendant if he had been drinking, and the Defendant said he had not been drinking. She drove him home. She said that after she pulled into the driveway and parked her car, the Defendant attempted to "snatch" her car key from the ignition and that the key fell on the floorboard. She said that she placed her foot over the key, that the Defendant drew back his fist as though he was going to hit her, and that she grabbed his arm. She ordered him out of her car, and the Defendant complied. She said that she backed out of the driveway and drove away quickly. She noticed the Defendant running across the yard as she backed out of the driveway and said she did not hear what the Defendant said.

Ms. Dansby testified that she and the Defendant were not arguing before he attempted to take her key. She said that she drove toward Columbia Market Store and realized the Defendant was following her, that she saw a vehicle "v-lining," and that the vehicle ran her off the road. She said she returned to the road and continued driving in the direction of the store. She said that when she turned in the store parking lot, she realized her brakes were not working, that she placed the car in park, and that she engaged the emergency brake. She asked the store employees if she could use the telephone to call the police because someone had forced her car off the road.

Ms. Dansby identified her white Cadillac in the store surveillance recording and agreed she drove onto the sidewalk and struck the cage of propone tanks. She said that at the time she asked the employees for permission to call the police, she did not know who was following her. She did not recall telling the store employees her boyfriend had run her off the road. She denied the Defendant was her boyfriend. She said she was terrified and did not know what was happening. She did not know if the driver was intoxicated but said she thought she needed to report the incident to the police. She did not see the Defendant get inside a vehicle when she drove away from the Defendant's mother's house.

Ms. Dansby testified that when she saw the truck enter Columbia Market Store parking lot, she ran inside the store to prevent being struck by the truck. She remembered the sound of glass shattering and running into the walk-in cooler. She agreed the surveillance recording showed she left the cooler, walked toward the truck, and that she returned to the cooler when she saw someone getting out of the truck. She recalled debris hitting her leg, which caused minor injuries. She said, though, she thought she was going to be killed. She did not see the driver's face at that time but learned the Defendant was the driver after she saw him get out of the SUV that struck the delivery truck. She did not see the SUV cause a head-on collision with the delivery truck. She could not offer an explanation for the Defendant's conduct.

On cross-examination, Ms. Dansby testified that the Defendant asked her to drive him to his house and that the Defendant said "something . . . about not knowing a good thing when you got one." At first, she thought the Defendant was singing along to a song on the radio but realized he was not. She said that she asked the Defendant to whom he was talking but that the Defendant never answered. She said the Defendant acted odd and was unusually quiet. She said the Defendant had never grabbed things from her or acted as though he was going to hit her.

Ms. Dansby testified that she was in the area where she picked up the Defendant because she was driving to a woman's home to find out if the woman could style her hair. Ms. Dansby had lost the woman's telephone number. She said she knew a man named Ted, who also lived in the area, but denied being with the Defendant at Ted's house the day before the incident. She agreed she had seen the truck the Defendant was driving previously but said "it did not register" with her that it was the Defendant at the time of the incident. She said that before December 9, she last saw the Defendant two weeks previously.

Ms. Dansby testified that she knew the Defendant received mental health treatment, although the Defendant never displayed any behavior indicative of mental health issues before December 9. She could not think of any reason the Defendant might want to hurt her and said the Defendant's conduct made no sense. On redirect examination, Ms. Dansby testified that when she met the Defendant, she and the Defendant were sober and that she had never seen the Defendant under the influence of alcohol, Xanax, and cocaine.

Pam Whitaker, the Defendant's sister, testified for the defense that she and the Defendant had lived together for about eleven years at the time of the incident. She said the Defendant received Social Security disability benefits because of his paranoid schizophrenia diagnosis in 2002. She said that on December 9, 2011, the Defendant was under the care of mental health professionals at "Center Stone." She reminded the Defendant to take his medications, which originally included Seroquel and trazadone. She said that around October 2011, Seroquel was replaced with Geodon.

Ms. Whitaker testified that she knew when the Defendant had not taken his medications because he was incapable of sitting still, sitting in a room by himself, or being around crowds. She said the Defendant's behavior reminded her of someone with attention deficit disorder. She knew to remind the Defendant to take his medication if she saw these behaviors and said she had reminded the Defendant about three or four times around the time of the incident. She said nobody dispensed the Defendant's medication to ensure he took it.

-12-

Ms. Whitaker testified that the change in the Defendant's medication to Geodon did not appear to have the desired effect and that she saw the Defendant's inability to focus and stay still. She said the Defendant became angry when he thought someone was "messing with him," thought someone was treating him poorly, and thought "his money wasn't right." She denied the Defendant was angry continuously about these things. She said that when the Defendant became angry at her, he yelled and cursed but that five minutes later he acted as though nothing had occurred.

Ms. Whitaker testified that "Dude" was the name of the voice the Defendant heard telling the Defendant to do things. She said that the Defendant first mentioned Dude at the time of his diagnosis in 2002 or 2003 and that the Defendant said he heard the voice at the time of the incident. She said that based on her experience, she knew the Defendant heard the voice if he was "staring into space" and that hearing the voice was correlated to the Defendant's not taking his medication.

Ms. Whitaker testified that at Thanksgiving 2011, the Defendant's behavior at a large family gathering was unusual. She said that the Defendant was hyper, jittery, and animated and that that he could only remain still or socialize for short periods of time. She said the Defendant looked as though he was "haunted." She knew the Defendant had probably not taken his medication. She said that over time she learned the Defendant's condition caused the Defendant to make poor decisions. She said that although their mother paid the Defendant's expenses from his disability income and gave the remainder to the Defendant with instructions to make the money last through the end of the month, the Defendant usually spent the money quickly.

Ms. Whitaker testified that after the incident, the Defendant continued having episodes in which she thought the Defendant was haunted. She said that it looked as though the Defendant was attempting to "hold it together" and to hold conversations but that she knew the Defendant was "zoned out." She said that frequently it looked as though the Defendant looked "straight through" people. She also said that the Defendant mentioned Dude after the incident. She said that if the Defendant were agitated, his agitation was focused on a specific individual regardless of whether the person mistreated him.

On cross-examination, Ms. Whitaker testified that the Defendant attended public school and completed high school. She said that the Defendant was institutionalized at the time of his original diagnosis in 2002 or 2003 and that since the diagnosis, the Defendant had not been institutionalized because he was not a threat to others. She denied the Defendant had ever hurt her or their parents. She agreed that after an episode in which the Defendant did not take his medication and heard Dude talking to him, the Defendant remembered the

events.  She agreed that the Defendant had substance abuse problems with cocaine and alcohol and that he did not have a curfew.

Ms. Whitaker testified that she had been around the Defendant when he was under the influence of cocaine and that the drug appeared to make the Defendant calm and sleepy.  She said alcohol made the Defendant talkative.  She said she was surprised to learn that the Defendant had relapsed relative to abusing drugs because he had been sober for two or three years at the time of the incident.  She denied witnessing the Defendant act violently or display extreme anger when the Defendant was sober.

Reverend Rose Taylor, the Defendant's aunt, testified that she was a youth pastor at Saint Paul African Methodist Episcopal Church and that she had known the Defendant all of his life.  She said the Defendant's mental health problems were subtle at first and became obvious over time.  She recalled a family gathering six or seven years previously during which the Defendant was "dark, depressed, off to himself, [and] not associating with the rest of the family."  She said the Defendant thought people were angry with him when no reason existed for anyone to be angry.  She said the Defendant was manic, "all over the place," entered and left rooms repeatedly, and teased people.  She said that the Defendant's teasing was "unmerciful[]" and that she slapped the Defendant as a result.  She said the Defendant left the room, returned twenty minutes later, and acted as though nothing had occurred.

Reverend Taylor testified that around the time of the incident in 2011, the Defendant displayed similar behavior and that the behavior was continuous the last six months of 2011.  She thought the Defendant had "trouble" with his medication.  She said that around October 2011, "they" noticed the Defendant's mood swings and "craziness."  She said that on Thanksgiving, the Defendant walked through her home as though he did not know what he was doing and talked to himself, although he appeared to be talking to someone.  She said the family decided to have the Defendant's physician determine if the Defendant's medications needed adjustment.  She said that although she had seen the Defendant talk to himself before Thanksgiving 2011, she had never seen the behavior as "pronounced" as it was that day.  She said about fifteen family members saw the Defendant's talking to himself.

Reverend Taylor testified that after the incident, a police officer escorted the Defendant to her father's funeral.  She spoke with the Defendant, who told her that he had no memory of the incident.  She told the Defendant to behave, and the Defendant gave her a blank expression and said, "Oh, I'm okay.  Everything is fine."  She knew the Defendant had no idea what she meant or why the officer was with him.

-14-

On cross-examination, Reverend Taylor testified that she had never been afraid of the Defendant, although the Defendant's behavior made her uncomfortable. She was familiar with the Defendant's cocaine and alcohol addictions. When asked if she had interacted with the Defendant while he was using drugs and alcohol, she said she was unsure because the Defendant's conduct might have been associated with his mental illnesses. She said that when the Defendant talked to himself, the Defendant could become verbally abusive but that the Defendant was not physically abusive.

Royce Whitaker, the Defendant's father, testified that he owned the truck the Defendant drove during the incident. Mr. Whitaker said that his truck was parked in the driveway where the Defendant lived with the Defendant's sister while Mr. Royce visited his brother in Texas. He denied giving the Defendant permission to drive his truck while he was in Texas, although he gave Ms. Whitaker permission to drive it. He returned home about two weeks after the incident.

Mr. Whitaker testified that the Defendant came to his home about three or four times per month. Although he could not recall when the Defendant was diagnosed with his mental illnesses, he recalled an incident when the Defendant was age twenty-two. Mr. Whitaker saw the Defendant "wupping something." Mr. Whitaker asked the Defendant what he was doing, and the Defendant said, "Dude acting up." Mr. Whitaker asked the Defendant about Dude, and the Defendant said, "Daddy, you don't see little Dude?" Mr. Whitaker said the Defendant continued talking about Dude for twenty years. Mr. Whitaker said the Defendant corrected Dude and attempted to make Dude stop doing things. Mr. Whitaker said that when the Defendant talked to Dude, the Defendant mumbled. Mr. Whitaker asked the Defendant what he was talking about, and the Defendant responded, "I'm just trying [to] have a conversation with Dude."

Mr. Whitaker testified that after the Defendant became sober and began attending church, the Defendant talked to Dude less frequently. He said that after the incident in the present case occurred, he saw the Defendant once or twice per month and that he had not heard the Defendant talk about Dude. He said, though, the Defendant acted as though he did not know what had occurred relative to the incident.

On cross-examination, Mr. Whitaker testified that the Defendant was around age twenty when the Defendant began talking about Dude and that the Defendant began using drugs about the same time. He agreed, though, the Defendant was at his best when he was not using drugs and alcohol. He did not know the Defendant was using cocaine and drinking alcohol at the time of the incident. He agreed the Defendant was not violent.

Andrea Troope, an expert in the field of licensed professional counselors with a mental health service provider designation, testified that she was a licensed mental health service provider with the Maury County School System. She had previously reviewed the Defendant's mental health records from Middle Tennessee Mental Health Institute (MTMHI) relative to a forensic evaluation conducted in 2012. Although she did not disagree with the findings and conclusions of the evaluation, her testimony would explain the findings and conclusions.

Ms. Troope testified that the Defendant was diagnosed with paranoid schizophrenia, which meant that someone suffering from the disorder was not always capable of functioning in reality and might hear and see things that other persons did not. She said the delusions and hallucinations associated with the disorder usually focused on someone's being "out to get," hurting, or judging the person, which included believing that someone was staring, following, and laughing at the person.

Ms. Troope testified that a patient suffering from paranoid schizophrenia had intermittent distorted images of reality and that the delusions and hallucinations associated with the disorder were not continuous. She said that medication managed but did not eliminate the symptoms. She said that when the symptoms emerged, a patient's behavior was not always predictable and that it was common for psychotic symptoms to occur when medication was changed. She said that an episode of symptoms might begin without warning and that the duration was unpredictable.

Ms. Troope testified that the most common hallucinations associated with paranoid schizophrenia were auditory in which a person heard something nobody else head. She said that auditory and visual hallucinations manifested during psychotic breaks. She agreed that if a patient who was previously diagnosed with paranoid schizophrenia began hearing something other people could not, the patient was suffering from a psychotic break. Ms. Troope said substance abuse, alcohol abuse, and stress could trigger a psychotic break.

Ms. Troope testified that generally a person suffering from a psychotic break looked as though the person was talking to himself, which affected the ability to communicate with other people. The Defendant's medical records reflected that the Defendant suffered from auditory hallucinations when he first arrived at MTMHI for the evaluation but was free from them when the evaluation concluded. She noted thirty days were usually required for a forensic evaluation.

Ms. Troope testified that the global assessment of functioning was a rating scale used to determine functionality relative to daily life, that the assessment was based on a clinical interview, and that the Defendant's functionality score was fifty-five out of 100. She said a

person with a score above seventy did not need therapy and that a person with a score of forty or below needed significant intervention, which might include hospitalization and residential treatment. She said the Defendant's score might not require hospitalization but would require intervention.

Ms. Troope testified that if a patient were seen talking to someone who was not truly there and that the patient had previously been diagnosed with paranoid schizophrenia, she could conclude that the patient was having a psychotic break. She said that the patient would have a skewed perception of reality and might not be capable of distinguishing between real and imaginary. She agreed that distortions of reality were possible during a psychotic break and that it was possible a patient experiencing a psychotic break might mistakenly think a green vehicle belonged to the patient.

Ms. Troope testified that a person suffering from a psychotic break might believe someone was "out to get" the person, although nobody was attempting to harm the person. She said that the person's ability to exercise reflection and judgment might be affected depending upon the degree of agitation, stress level, IQ, amount of medication in the person's system, and whether the person had consumed drugs and alcohol. She said that the consumption of alcohol and cocaine would increase the psychotic break symptoms.

Ms. Troope testified that changing or modifying a person's medications would likely increase the psychotic break symptoms. She said that the usual procedure to change medications was to slowly decrease one medication and then add a new medication. She said that during the transitional period, a person's psychotic break symptoms might be worse. She said that some patients experience flat affect during a psychotic break and that others experience mania, which included excessive energy, euphoria, agitation, excitability, restlessness, jittery behavior, and an inability to sit still.

Ms. Troope testified that a person suffering from paranoid schizophrenia and from a psychotic break might not appreciate the logical result of the person's conduct to the same degree as a person who was not suffering from the disorder. She said irrational was defined as the inability to make logical, calm choices. She said that a person previously diagnosed with paranoid schizophrenia and experiencing a psychotic break had "almost exclusively" irrational actions and thoughts.

On cross-examination, Ms. Troope testified that the mental health records she reviewed were created during an evaluation to determine whether the Defendant was competent to stand trial, whether he "qualified" for an insanity defense, and whether he was committable. She agreed with the conclusions stated in the report that the Defendant was competent to stand trial, did not qualify for an insanity defense, and was not committable.

She had not reviewed the surveillance recordings from Columbia Market Store but saw a portion of the recording on the local news. She agreed she became involved in the case about one week before her testimony.

Ms. Troope testified that she could not determine to any degree of medical certainty whether the Defendant experienced auditory or visual hallucinations on December 9, 2011. She said that most people suffering from paranoid schizophrenia did not remember events occurring during a psychotic break.

Dr. Rokeya Farooque, an expert in forensic psychiatry, testified in rebuttal that in March 2012, she evaluated the Defendant to determine his competency, whether he was capable of participating in his defense, whether he qualified for an insanity defense, and whether he needed to be committed. She concluded to a reasonable degree of medical certainty that the Defendant was competent to stand trial. The Defendant understood the charges against him, knew what had occurred before he was charged, knew about the court procedures, and was able to demonstrate that he could work with counsel to prepare his defense. She noted that she had observed the Defendant during the trial and that she believed the Defendant remained competent. She noted the Defendant was able to follow the testimony and was behaving properly.

Dr. Farooque testified that she concluded to a reasonable degree of medical certainty that the Defendant did not qualify for an insanity defense and that the Defendant did not meet the criteria for involuntary commitment to a mental health institution. She said she diagnosed the Defendant with paranoid schizophrenia, alcohol abuse, marijuana abuse, and cocaine abuse. She said that although the Defendant suffered from paranoid schizophrenia, she did not believe to a reasonable degree of medical certainty that his mental illness affected his cognitive ability on the day of the incident to know the difference between right and wrong or his ability to appreciate the nature and wrongfulness of his conduct.

On cross-examination, Dr. Farooque testified that she was present during Ms. Troope's testimony and that she thought Ms. Troope provided accurate information relative to explanation of paranoid schizophrenia. Dr. Farooque said, though, that she had no information about whether the Defendant experienced a psychotic break during the incident. She admitted it was possible the Defendant experienced a psychotic break but said, "We did not see that the mental illness ha[d] any bearing" on the Defendant's conduct. She said a person experiencing a psychotic break might still appreciate the nature and wrongfulness of the person's conduct. She agreed, though, that suffering from paranoid schizophrenia and from a psychotic break might affect a person's ability to exercise good judgment.

On redirect examination, Dr. Farooque testified that alcohol and cocaine might affect impulse control and judgment but that the effect of the substances would not affect the ability to appreciate the nature or wrongfulness of conduct. She said that a person suffering from paranoid schizophrenia who consumed cocaine might have a lapse in judgment and impulse control but retain the ability to appreciate the nature and wrongfulness of the person's conduct.

Upon this evidence, the Defendant was convicted of attempt to commit first degree murder, two counts of aggravated assault, reckless endangerment, and theft. This appeal followed.

The Defendant contends that the evidence is insufficient to support his attempted first degree murder and theft convictions. He does not challenge his remaining convictions. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

### Attempted First Degree Murder

A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has

-19-

the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (Supp. 2011) (amended 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id*. (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

The Defendant argues the evidence reflects that his suffering from paranoid schizophrenia and his consuming alcohol and cocaine before the incident prevented him from acting with reflection and judgment, rendering him incapable of premeditation. We disagree. The evidence in the light most favorable to the State shows that Dr. Farooque concluded to a reasonable degree of medical certainty that although the Defendant suffered from paranoid schizophrenia, his mental illness did not affect his cognitive ability to know the difference between right and wrong on the day of the incident or affect his ability to appreciate the nature and wrongfulness of his conduct. Although Dr. Farooque said it was possible the Defendant suffered a psychotic break on the day of the incident, no evidence showed that his "mental illness ha[d] any bearing" on his conduct and noted that a person experiencing a psychotic break and suffering from paranoid schizophrenia could appreciate the nature and

wrongfulness of the person's conduct. She noted that although alcohol and cocaine might affect impulse control and judgment, the substances would not have affected the ability to appreciate the nature and wrongfulness of conduct. The jury's verdict reflects that it credited Dr. Farooque's testimony and found that the Defendant was capable of exercising judgment and reflection.

Likewise, the record supports the jury's finding that the Defendant acted with premeditation on the day of the incident. After the victim left the Defendant's home, the Defendant entered his father's truck and chased her. The Defendant bumped the victim's car with the truck, causing both vehicles to enter a field. The truck was damaged, and the Defendant had difficulty returning to the road. After returning to the road, the Defendant inspected the damage to the truck, entered the truck, and drove toward Columbia Market Store and in the direction the victim traveled after she returned her car to the road. The Defendant drove at a high rate of speed to the store and drove through the entrance of the store without attempting to stop or slow down. Trooper Alexander's expert opinion was that the truck accelerated as it entered the store, which was supported by the tire marks in the store's parking lot and by the surveillance recording. We note that the victim was outside the store at the time the Defendant drove into the parking lot and that the Defendant struck the victim's car with the truck before driving through the building. We conclude that the evidence is sufficient and that the Defendant is not entitled to relief on this basis.

## Theft of Property

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). The evidence must show that a defendant "knowingly obtained or exercised control over" the property, "did not have the owner's effective consent," and "intended to deprive the owner of the property." *State v. Amanns*, 2 S.W.3d 241, 244-45 (Tenn. Crim. App. 1999). The intent to deprive may be based solely upon circumstantial evidence, and a "jury may infer a . . . defendant's intent from the surrounding facts and circumstances." *State v. Roberts*, 943 S.W.2d 403, 410 (Tenn. Crim. App. 1996); *see State v. Scates*, 524 S.W.2d 929, 931 (Tenn. 1975).

The Defendant argues that the evidence is insufficient to support his conviction. Although he concedes that the Defendant entered the SUV, that the SUV did not belong to him, that he did not have the owner's effective consent to drive the SUV, and that he drove away from the scene, he argues no evidence shows he intended to withhold the SUV permanently or for such a period of time as to substantially diminish the value or enjoyment of the property. He asserts, rather, that he only intended to use the SUV to escape from Columbia Market Store.

Although the Defendant relies on *Young v. State*, 487 S.W.2d 305 (Tenn. 1972), to support his position, his reliance is misplaced. In the context of robbery, our supreme court stated that "[t]he taking of the property must be animus furandi, that is, with the intent to deprive the owner permanently of his property. As an aggravated form of larceny, robbery requires an intent to steal. The intent must exist at the time of the taking[.]" *Id.* at 307 (internal quotation marks and citation omitted). In *Young*, when a sheriff's deputy walked the defendant to his jail cell, unlocked the cell door with a key, and opened the door for the defendant to enter, the defendant produced a gun. The defendant's cellmate took the deputy's key, ordered the deputy to enter the cell, and locked the door with the key he took from the deputy. *Id.* at 306. The issue on appeal was whether the defendant had the intent to commit robbery separate and apart from his intent to escape from jail. *Id.* The defendant maintained that he did not touch the deputy or the key, that he did not want to take the deputy's money or life, and that he only wanted to get out of jail. *Id.* at 307. Our supreme court concluded that insufficient evidence existed showing the defendant intended to steal the deputy's key, that the defendant's only intent was to escape from jail, and that the taking of the deputy's key was only to delay the police from apprehending him. *Id.* at 308.

However, in *State v. Scates*, the supreme court clarified that the holding in *Young* was limited to the specific facts of the case. 524 S.W.2d at 932. The defendant in *Scates* was confined in a state correctional facility but working at a nearby state park with other prisoners. The defendant and another prisoner threatened a prison guard and a park superintendent with axes, forced the men to lie on the ground, and forced the superintendent to give them the key to the superintendent's truck. The Defendant and the other prisoner drove the truck several miles and abandoned it. *Id.* at 930. Our supreme court affirmed the robbery conviction and stated that although the intent to deprive the owner of the property is an element of the offense, intent can be established by circumstantial evidence. *Id.* at 931. The court concluded that extending *Young* beyond "its precise facts would be contrary to the public interest" and that the defendant "did more than merely retard pursuit." *Id.* at 932.

We note that at the time of *Young* and *Scates*, robbery was an aggravated form of larceny, that our criminal statutes have since been amended, and that larceny no longer exists. The enactment of the general theft statute "eliminated the traditional distinctions between various unlawful takings[.]" *Amanns*, 2 S.W.3d at 243. Additionally, deprive now includes the defendant's "[d]ispos[ing] of property or us[ing] it or transfer[ring] any interest in it under circumstances that make its restoration unlikely." T.C.A. § 39-11-106(a)(8)(C) (Supp. 2011) (amended 2014).

In the present case, the record reflects that Ms. Stavropoulos saw the truck the Defendant was driving "parked erratically on the side of the road" on the morning of the incident. She said the truck backed up, almost struck her Dodge Durango, and drove toward

Columbia Market Store. Ms. Stavropoulos called 9-1-1 and followed the Defendant to the store, where the Defendant drove the truck through the store. Ms. Stavropoulos parked her SUV at a gas pump, got out of her SUV, and walked toward the store to assist anyone inside. Ms. Young stated that Ms. Stavropoulos left the engine running and the driver's side door open. Ms. Young also testified that she yelled for the Defendant not to take the SUV and that the Defendant acknowledged he heard her. The Defendant entered Ms. Stavropoulos's SUV and attempted to drive away, although the Defendant caused a head-on collision with a delivery truck. Ms. Stavropoulos heard someone yell that the driver of the truck was stealing her SUV. Ms. Stavropoulos denied giving the Defendant permission to drive her SUV and testified that she paid $17,000 for the SUV in 2011 and that she owed $9000 at the time of the incident. We note that before taking Ms. Stavropoulous's SUV, the Defendant unsuccessfully attempted to take Ms. Dansby's car key after she drove him home. After the Defendant's unsuccessful attempt to take Ms. Dansby's car key, he obtained his father's truck without consent and drove it into the store. We conclude that the jury could have reasonably inferred the Defendant knowingly obtained control over the SUV without Ms. Stavropoulos's effective consent and intended to deprive Ms. Stavropoulos of the SUV. The Defendant is not entitled to relief on this basis.

Based on the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE